May it please the court, I'm Kimberly Albrow here on behalf of the appellant Jamal Lewis. Mr. Lewis raised three issues in his brief. I believe the court may be most interested in the criminal domestic violence of a high and aggravated nature which I will refer to as CDV-HAN and address first. The CDV-HAN statute has changed somewhat over time in South Carolina and the version under which Mr. Lewis is convicted involves two elements that have remained the same and they are the two elements that were addressed in Chisholm that by necessity had to have been deemed violent. It's physical harm or injury to a household member and an offer or attempt to cause physical harm or injury to a household member and Mr. Lewis's position is that those elements are not violent. They currently consist of those two elements together are third degree CDV in South Carolina right now and that's under the newer version but that just gives you an example of how it's treated by the legislature that it's a $1,000 to $2,500 penalty currently and a maximum prison sentence of 90 days. I have checked repeatedly and so far no cases on just those two elements have made their way up through South Carolina appellate courts. However, the cases that I did find that were in the time period of Mr. Lewis's... Are there any South Carolina CDV conviction cases in which you can find where no one was touched at all? I cannot find any where no one was touched at all. The three that I found related to these two elements are the Leopold case which involved a push, the Ramsey case where a man bruised his wife's hand while grabbing her cell phone. So I don't know how much touching was involved in that. It couldn't have been minor touching if it resulted in a bruise. Right. And then a slap. So those kinds of things Mr. Lewis... Also not a minor touching. But it also doesn't involve violent physical force of the type described in Johnson 2010. Now that's just one part of the CDV hand statute. The other part is the hand part, the high and aggravated nature. And when Mr. Lewis was convicted that involved... It involves an assault and battery. In the briefs I've gone back for many, many years and assault and battery in South Carolina historically doesn't involve the type of physical, violent physical force that would satisfy the Supreme Court definition for a violent felony. However, they also involve three other... The elements include three other things that contribute to the high and aggravated nature. One is that there was a possession of a weapon. One is that there was serious bodily injury. And the third is that it's just an assault that can be felt with or without a battery where it's from the victim's point of view, it's in a subjective point of view where that person fears a certain kind of injury. But what do we make of the fact that we also were not able to locate any such cases that didn't involve minor... That involved just minor touching? Well, a lot of the cases that I cited in the brief don't give any facts at all. That was the problem with the research on the CDB ham because a lot of CDB ham cases, they just don't recite the facts of the case. And because it's changed over time, there's only the small window in which to get cases. So what I had to do in my briefing to try to explain Mr. Lewis's position is to look at these elements and look at the associated assault and battery and things of that nature to try to piece together how that offense is applied in South Carolina. And again, the two elements that were at issue in Chisholm, which this court in the unpublished opinion previously said were violent, those cases alone, just those two elements, I do believe that the slap, the bruise to the hand, that isn't the type of violent physical force that would warrant something being a violent felony. Also, with the high and aggravated nature, the resulted in serious injury is the resulting in the physical injury, it's not the use of violent physical force. And although the 28-J letter was filed citing Castleman, Mr. Lewis's position is that Castleman was specific, the Supreme Court specifically held that that was specific to the force for common law, which was specifically applied in the misdemeanor domestic violence situation. The risk of physical injury also is not the type of violent physical force that can result in, is not enough to be a violent felony. And there are several cases on that. The Second Circuit that causing physical injury or death without requiring the cause to be by violent force is not enough. There's a more recent First Circuit case from 2015, White v. Lynch, that followed the Chernowsky reasoning, holding that there is a realistic probability that physical injury could result without the use of violent physical force. So the language of the high and aggravated nature part of the statute just doesn't require enough to be a violent felony. Additionally, I'm actually, unless my colleagues have further questions on this issue, I'm actually very interested in the identification arguments here. Oh, I'm happy that you are, because from the calendar it looked like you're more interested in the CDB Hand Issues. The unconstitutional identification. There were actually two identifications that occurred here. One was the photo identification, and then there was the show-up identification. So the photo identification was certainly impermissibly suggestive, and it was unnecessary. And it was suggestive because they showed a photo of only one person. There was no comparison. The police had been out there for hours. They could have put together an array of photographs, but they did not do so. And the witness told the person, the witnesses were told that the person in the photo would be brought from the apartment. So that certainly made it suggestive for the following show-up. The photo identification was unnecessary because they had the live person arrested in the apartment. They could have brought him out. Additionally, since Mr. Lewis was arrested, he could have been transported to the police station, and the two witnesses could have come to the station the next day and had a full line-up with people who were of similar build and look as Mr. Lewis. So if it was unnecessary, then what is your best argument for harmless error here, assuming I agree with you that the identification procedures were flawed? Probably my best argument was in the briefs, but in some it is that these two witnesses identified a man who went into the apartment. Without the testimony that he was the man that they saw with a gun, the government cannot prove beyond a reasonable doubt that the verdict wouldn't have changed. What about the witness who testified that he came to her door with a gun? He did, and that was Venus Santiange. I'll call her Venus for ease. She had testified at the trial that she thought somebody had come through her house when she was upstairs after Mr. Lewis was in the house. She also testified that she thought Mr. Lewis tried to leave her house. So she doesn't know whether or not he was there or not. Additionally, her testimony was unreliable, which could have been pursued further at trial if not for these other witness identifications, and it was pursued on cross-examination. It was pursued at trial. That her prior identification, she could not make an in-court identification, but she maintained that there were some inconsistencies. That was brought out on trial. That was Ms. Shuler. That was the Venus Santiange never told the police that Mr. Lewis had a gun for more than a year later, and it came out at trial that she had troubles of her own because drugs were found in the apartment, and that would also go to the fact that Mr. Lewis was not found with the gun on him. The gun was found in the house, and at the time nobody admitted or said who the gun belonged to. So certainly there are other things which would have been stronger evidence in Mr. Lewis being not guilty if these two witnesses hadn't come forward and said that in fact they identified him and knew that that was him. Wasn't the apartment secured though? I mean, once the perpetrator went into the apartment, wasn't it secured and watched until the warrant could be obtained, until the police went to the door and went in and there he was? It actually wasn't. There was testimony that I believe I pointed out in the brief, but I don't see it in my oral argument notes, but the police officer showed up. He admitted that he stayed in the front of the apartment, and it took a while for the backup to get there before they went around and secured the back. And in addition to that, there was a back door, and that's where Ms. Santiange, whose apartment it was, said, well, I thought that somebody came through my apartment, and I know Mr. Lewis tried to go out that back door, but no police officer ever testified that he tried to go out the back door. So therefore, they could not have been watching the back the entire time because they would have seen Mr. Lewis at least stick his head out or try to go out that back door. So that's another factor that weighs into whether or not it was secured or anyone would have seen him leave. Now, once you get past this impermissibly suggestive photo array, there is the question of the courts looking at the totality of circumstances. And I don't know that I can do a better job than the amicus brief did in pulling out some of the facts, but one of the factors is the opportunity to view the suspect. And when you read through Mr. Alexander and Ms. Shuler's testimony, you know, you can see that, well, initially, Ms. Shuler went outside and she saw a shooting. And it was getting dark, and on cross-examination, it came out that the road was really, really far away. And she admitted she did not get a good look at the suspect. When she told her boyfriend, Mr. Alexander, they both went out in the parking lot, and they both testified that they were between two vehicles, and they only saw him, and both described it as the word quickly. He quickly ran by. And Mr. Alexander testified that he told Ms. Shuler to get behind him because he was worried for her safety. Therefore, you've got a much bigger man, if you see on the video the size difference, he's a big man, had Ms. Shuler behind him. So she probably couldn't have gotten a good view of the suspect. But he also, although he claimed very convincingly, no, I saw him, if you read through his testimony, he described with so much detail the gun that the suspect was holding that he couldn't have possibly, in that quick moment when the suspect ran by, have seen much of his face because he described it as a .45 caliber gun, called it blocky. He said that the person was trying to get it unjammed. Then he talked about a bullet being ejected from the gun and that he looked down at the ground and saw it on the ground. So a lot of this time, and this was a very, very quick few seconds, he couldn't have been looking at the face of the person. And some of the research on identification issues shows that when someone has a gun, witnesses tend to focus on that gun and not the face of the suspect. It makes it very unreliable. The witness's degree of attention, that's one of the second factors under the totality of the circumstances. I put it in my briefs, but both of them admitted to being very, I think, freaked out is the term that they used. Mr. Alexander admitted that he was nervous and worked up. And then there's the accuracy of the witness's prior description. In the suppression hearing testimony, Mr. Alexander gave a different, the officers testified that Mr. Lewis was wearing a lighter shirt than he gave at trial. And that certainly could have been affected by him seeing Mr. Lewis being brought out of the house the day of the incident. He, according to the officers, Mr. Alexander and Ms. Shuler said the man was in dark clothing and jeans. So that was, the description is not accurate of what he was wearing when he was brought out of the house in a white T-shirt, I mean light pants and a shirt. And then the level of certainty regarding identification. I would just like to point out that Mr. Alexander, although he quickly said when Mr. Lewis was brought out of the house, that's him. He testified at trial. I knew it was him before they even shined the light on him. But I think that goes to what the Innocence Project put in their brief about this. They basically told him it was going to be him. They did. When they showed them the photographs, they said, we will be bringing him out shortly. So I just, there's no way that that could not have influenced identification. And I see my time is up. So unless you have further questions. Thank you very much. Thank you. Mr. Taylor. Good afternoon. How are you? Members of the court, I believe the court is ready for the initial understanding that I have. So I'll just start with that issue, if that will please the court. In this matter, United States v. Jamal Lewis, and I'm sorry, I'm Chris Taylor on behalf of the government. The district court ruled that the identification procedure in this case was unnecessarily suggested. However, under the totality of the circumstances, the court ruled that the identifications were reliable by Ms. Shuler and Mr. Alexander. During the testimony at the suppression hearing, Mr. Alexander indicated how close he had been to Mr. Lewis when he had come through the parking lot with a firearm that evening. Also, Ms. Shuler indicated that she had also seen a person outside with a firearm. She went back inside the apartment to tell Ms. Alexander what had happened. When they came out, they saw. And she said she was freaked out and doesn't focus well in situations like that. And then she wasn't able to identify him in court in the one instance. That is absolutely correct, Your Honor. She was not able to identify him during the suppression hearing. However, the court looks at the actual show of videos involving Ms. Shuler and Mr. Alexander. I think an important note is, even though a picture was shown to Ms. Shuler prior to the identification, she did something very important that I think the court should be aware of. She made clarifying descriptions of Mr. Lewis. And if so, if the concern is – I just want to – I'm sorry. I just want to clarify. Does the government concede, as the district court found, that this procedure was unnecessarily suggestive or not? We did not argue that in our brief. The officer who put together the lineup was not available, did not testify at the suppression hearing. I think that was, of course, a basis for the district court to determine. So the government does not refute that this procedure was unnecessarily suggestive. Is that right? That's right, Your Honor. Okay. That's not your argument. I mean, because you can't concede for the government. I'm pretty sure, at least when I was a government attorney, I could never concede for the government. But you're not affirmatively arguing that basis now? Right, Your Honor. Okay. But even setting that issue aside, we do still believe that in the totality of circumstances, there was a sufficient opportunity, attention and accuracy, certainty and length of time between the actual – the actual crime taking place and the identification by Ms. Shuler and Mr. Alexander. And as I was saying, with Ms. Shuler, when she described how he looked different, I believe she made comments about he was normally dressed a different way. She said she knew Ms. St. Onge, who was in Apartment 6, prior to this. I believe all these factors point to the reliability of Ms. Shuler. Now, the opposing counsel says that the apartment was not secured by law for a period of time, particularly that back door. What does the government say about that? What do you – what's your response to that? Your Honor, I think – I believe in the suppression hearing, there was some testimony that some officers had gone to the back to check. I'm not sure if they actually stayed in the back of the apartment. The front of the apartment, I believe, had been secured once the police arrived, because actually –  during the whole incident, I do not believe so, Your Honor. However, under the particular circumstances of this case, Detective Keitling would say that he had contacted Ms. St. Onge. I think the police had been on scene for several hours before they were finally able to obtain a search warrant to go into Apartment 6, to go upstairs, to find Mr. Lewis and Ms. St. Onge upstairs, and also the weapon inside of the apartment testified at trial that Mr. Lewis, in fact, came into the apartment with a firearm. As the court has already recognized, she – during cross-examination, she recounted some of the reasons why at the time she was not honest with the police about what had taken place. But all of those reasons were fleshed out on cross-examination and given to the jury for them to be able to consider her credibility. So I don't believe that this is a case that relied solely on the testimony of Ms. Shuler and Mr. Alexander in order to determine whether or not Mr. Lewis was, in fact, in the apartment with a firearm. So if the identification evidence is suppressed, what is your strongest evidence for conviction? I believe Ms. St. Onge would be the strongest evidence for conviction against Mr. Lewis. The woman who gave the conflicting testimony in various versions of the story. That's correct, Your Honor. As I said, she was – she did bring out on cross-examination some of the reasons, and also her behavior was really not consistent – well, I would say more consistent with what she said at trial as to the reasons why she was not honest with the police when this incident first took place. She was in the apartment for almost three hours with Mr. Lewis prior to the police entering that apartment. If Mr. Lewis had not been the person who had come into the apartment with the gun and also threatened her – Does the government know what happened to the photographs that were shown to Ms. Shuler and Mr. Alexander? They're not in the record. Your Honor, I believe Detective Keitlinger brought those up either on a telephone or on a computer that was inside of Officer Riebesel's car where the identification took place, but they were not entered into the record. And there was at least some testimony or talk of a video that was outside of apartment 5. That also isn't in the record. Does government know what happened to that? Your Honor, I believe when the officers went back to get a copy of that video – this is one of the situations where the time stands – Is this a surveillance video? Yes, Your Honor. It was in a next-door apartment and it was actually pointing down, I believe, to apartment 6. And the officers saw the video on scene. I believe Officer Alexander testified that they had actually looked at it and saw the person go into apartment number 6. However, when they tried to obtain a copy of it, they were not able to because of the time differential, I think they had actually copied the wrong segment of the video. So the actual portion of it – So truly without the identification evidence of Ms. Shuler and Mr. Alexander, the woman in the apartment is – all the government would have because you don't have the photographs that were shown. You don't have the video that would show the jury could see for themselves. And you wouldn't have any eyewitness testimony. You would have the woman in the apartment. Right, Your Honor. But I still think that the identification by Ms. Shuler and Mr. Alexander was reliable under the circumstances. I understand that. But if I don't think it was reliable, I'm just wondering about your harmless error argument. That's correct. What did they find? They came to the – they have a surveillance video that seems to have disappeared that apparently showed a gentleman with a handgun entering the apartment. And then they searched the apartment and they found Mr. Lewis in a bedroom with the woman and the handgun. That's correct, Your Honor. A .45 caliber handgun that was the same type of handgun that Mr. Alexander had described to the police officer. And Mr. Alexander had described that Mr. Lewis had come through the apartment appearing to try to rack the firearm in a shell casing. Mr. Alexander was the person who made the 911 call? That's correct, Your Honor. Can I ask you a question about when they went in the apartment and found – you said they found him with the woman in the apartment and a handgun. Where was the handgun? Was it in his hand? No, Your Honor. It was on the bed. It was in the bedroom where they were. Ms. St. John's, I believe, was in the closet. She was there too? Yes, yes. She, I believe, was in the closet and Mr. Lewis was in the room. And did she later – didn't she testify later that – or at least I thought I understood you to say or somebody to say that part of her issues with the truth initially were because she was dealing drugs out of that apartment? Your Honor, I'm not sure if she actually said that. I believe during the trial she said she was more concerned, she was more fearful of Mr. Lewis and that was one of the basis of why she was not honest with the police. There were things that he was telling her. Was it her apartment? I believe it was her apartment. And the gun was in her apartment, in her bedroom? In her bedroom, yes, Your Honor. Was he in the – she was in the closet, the gun was on the bed, and he was just in the bedroom? He was in the bedroom. I believe they found him on – he may have but he was in proximity to the crime scene. My recollection was that – which could easily be wrong – is that they were both seemed to be trying to – in positions of trying to hide. Was that – it doesn't matter but that was sort of my recollection. She was secreted in the closet but they were – the three of them were within six feet of each other in the gun. I believe that's correct, Your Honor. But we would ask that the finding of the district court was clearly erroneous in this case and that the – it was permissible to allow Ms. Shuler and Mr. Alexander to testify to the jury as to what they had seen that night in regards to Mr. Lewis entering the apartment. Your Honors, in regards to the CDBHAN issue, as the court has already acknowledged, there are not any South Carolina cases. Not on CDBHAN. There are cases – CDB cases but there aren't any that I'm aware of on the CDBHAN that involve just minor touching. That's correct, Your Honor. It appears that in order to be convicted of a crime from the issues cited in our brief that there has to be physical harm to a household member with the present ability under the circumstances creating fear of imminent peril to the victim. Most of – there were several other cases that we had cited in our brief that basically all indicate some type of physical injury to a victim in a CDB type related case. It could be getting a female – it was a case of wounds to a female as well, nose fractures, cuts, abrasions, those types of issues or facts have all been determined to show that physical injury is required for conviction of CDBHAN in South Carolina. There are no other questions on that issue. There was an additional issue as to a mistrial that – The judge gave a curative instruction and we presume that juries listen to curative instructions. That's correct, Your Honor. Thank you so much for your time. Thank you. Just briefly to address some of the things that came up. The length of time, I did not get to that factor on my original time up here. As the amicus brief pointed out, even two hours is considered a time that can affect the reliability of an identification and this was a four hour time period late at night. They had been under a stressful situation so I don't think that factor weighs in favor of the identification being reliable. Also, some other things that came up when the photographs were shown to Ms. Shuler, it's not perfectly clear from her testimony but the indication is that she never told the police when they first responded that she recognized Mr. Lewis, that she had seen him at Ms. Santune's apartment before. She didn't say that until she identified the photographs. Additionally, she said, oh, he has neck tattoos from the photograph and neither she nor Mr. Alexander told any of the police officers or said that the man they saw with the gun in the parking lot had neck tattoos. Which would be a pretty identifying factor and something that could weigh in their favor toward how much of a good look they had at him. Additionally, I think it was Judge Thacker that asked about whether or not Ms. Santune had drugs in the apartment. It did come out on cross-examination during trial that she only talked to the police a year later when she told them that Mr. Lewis had a gun because she had state charges pending and she was trying to get those resolved. She went with her attorney to talk to the police and that's when she first told them about the gun. On JA, the Joint Appendix page 238, she never would directly answer Mr. Lewis' counsel's question but the indication was that she told the police that night that he did not have a gun because Mr. Metz, who was Mr. Lewis' trial attorney, asked her, didn't you tell the police? She said, well, I was scared and that was her repeated theme. It seems like she changed her story. Well, she did change her story but it was presented the conflict was squarely presented on cross to the jury. Right. But without the witness identification during this trial procedure it certainly would affect whether the government can show here today, beyond reasonable doubt, that they the outcome would have been the same. Had the motion to suppress been denied before she finally told the police that Mr. Lewis had a gun? Do you know that? I don't know. Do you want me to graph that? I am not sure whether she, it was a, I don't know. And if there are no further questions? Thank you very much. We will ask the clerk to adjourn court sine die and then come down and brief counsel. This honorable court stands adjourned sine die. God save the United States and this honorable court.
judges: Allyson K. Duncan, Stephanie D. Thacker, Max O. Cogburn, Jr.